Donahue, J.
The case of State, ex rel. Weinberger, a Taxpayer, v. Daniel T. Miller et al., is a proceeding in error to reverse the judgment of the circuit court of Cuyahoga county. The case of State, ex rel. Fritch, v. Board of Deputy State Supervisors of Elections for Summit County, et al., is an action in mandamus filed originally in this court, and the only question arising in both of these cases, is the question of the constitutionality of the act of the legislature passed February 17, 1911 (102 O. L., 5), entitled, “Ah act to provide for the election of judicial officers by separate ballot.” It is claimed on the part of the relator, in each of these cases, that this act is unconstitutional for the following reasons: 1. It is in violation of Section 2, of Article V, requiring that all elections shall be by ballot. 2. It is in violation of Section 1, of Article V, providing that all citizens possessed of the requisite qualifications shall be entitled to vote at all elections. 3. It is in violation of Section 26, of Article II, in that it does not operate uniformly upon the subject-matter of elections.
*26 Before discussing in detail any of these objections to the validity of this legislation, it might be profitable to consider briefly the' right and authority of a court to declare statutes unconstitutional, and when and under what circumstances a court should do so. These subjects have been considered in a great many reported cases in the Supreme Court of the United States, in this court, and in the supreme court of other states of the Union, but nowhere is the principle involved more clearly stated than in the opinion of Chief Justice Marshall in the case of Marbury v. Madison, 1 Cranch, 137. In that case it is said: “That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected. * * * The principles, therefore, so established, are deemed fundamental. And as the authority from which they proceed is supreme, and can seldom act, they are designed to be permanent. * * * The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. * * * It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it.”
There can be no honest controversy but that the written constitution of the state is the paramount law, and while courts are required to accept the law as given them by the lawmaking power of the state, yet when that law is clearly in conflict with the constitution under authority of which it *27 was enacted, it is the duty of the court to sustain the paramount law and refuse to enforce any and all legislation in contravention thereof. Any other course would lead to the destruction of the constitution, which is the supreme law written by the supreme power of the state, the people themselves. The oath of office administered to every judge requires him to support the Constitution of the United States and the Constitution of the State of Ohio. It follows, therefore, that the question of the constitutionality of an act of the general assembly is a question that appeals to the conscience of the court, as well as the conscience of the individual members of the legislature, and by the very terms of his oath of office it becomes the duty of a judge to refuse to enforce any act of the legislature in conflict with the constitution.
It by no means follows, however, that a court should refuse to give full force and effect to an act of the general assembly of the state because its constitutionality is doubtful. Upon this question the same high authority, Chief Justice Marshall, in the case of Fletcher v. Peck, 6 Cranch, 87, declared: “It is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the laws should be such, that the judge feels a clear and strong conviction of their incompatibility with each other.” Judge Ranney in writing the opinion of this court in the case of C. W. & Z. Railroad Co. v. Commissioners, 1 Ohio St., 77, uses this language: “It is never to *28 be forgotten, that the presumption is always in favor of the validity of the law; and it is only when manifest assumption of authority, and clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful case. And this results from-the very nature of the question involved in the inquiry.”
In the case of C. C. C. & St. L. Ry. Co. v. Wells, 65 Ohio St., 313, Davis, J., in writing the opinion of this court, epitomizes all the authorities on this question and gives expression to the principle to be deduced therefrom in this clear and forcible language: “It is not the duty of the courts, and they will not make haste, to declare á statute void upon a mere suggestion of conflict with the constitution. On the contrary, it is a principle firmly imbedded in our jurisprudence that it must be a clear infraction of the constitution which will authorize the courts to intervene and overthrow an act of the legislature.”
This then is the established doctrine in this state, and the discussion or citation of further authorities would be superfluous. But there are some other considerations that now obtain in Ohio that should be given due weight. It is incumbent on each officer of the different departments of our government to perform the duties and exercise the authority of his office without in anywise interfering with the power, discretion, or authority of the officers of either of the other departments. But, it is the duty of each and all to insist vigor *29 ously and effectively upon the observance of every provision of the constitution. In this state, the governor, as the chief executive officer, now has authority to veto the acts of the legislature, and therefore it becomes his first duty when a law is presented to him by the general assembly for his signature, to determine the constitutionality of that law, and if in his opinion it is clearly unconstitutional he violates his oath of office if he sign or approve the same; and, if he desires he may call to his aid in determining this question the attorney general of the state. This law here attacked as unconstitutional received the sanction of the executive head of our state government and the same was signed and approved by him, so that not only one but two of the coordinate branches of our state government have passed upon the constitutionality of this act, and it would seem that the presumption in its favor that always obtains because it was enacted into a law by the legislature of the state, is largely strengthened by the fact that its constitutionality has also been passed upon and approved by the executive department, and before a coordinate branch of the government should declare it unconstitutional it should now appear that it clearly and undoubtedly offends against the positive provisions of the constitution. Not only this, but in the case that is here upon error the common pleas court and the circuit court have held this law constitutional. It is said by counsel for relator in their briefs that the judgments in those courts were pro forma. But we do not understand that the courts of Ohio have any. right, to enter any judgments pro forma. *30 The question was properly before each of these courts and it was the duty of each to determine the constitutionality of this act before giving it judicial sanction, and the presumption is that each court did its duty.
Another thing that should not be overlooked by this court in disposing of this question is the fact that by Section 2 of Article IV of the constitution recently adopted in this state, it is provided that: “No law shall be held unconstitutional and void by the supreme court without the concurrence of at least all but one of the judges, except in the affirmance of a judgment of a court of appeals declaring a law unconstitutional and void.” It is true that this provision of the new constitution is not now in effect, but the fact that it has been adopted clearly shows that the people of this state are of the opinion that courts have been too ready to find constitutional objection to legislation, and while personally I feel that the courts have done a splendid work in this behalf and have thereby protected the people from terrific burdens of local debt and have prevented a chaotic mass of local legislation that would be well-nigh intolerable, yet the opinion of one man is not important when the people of the state have declared for another policy.
A court does not hold a law unconstitutional for the mere pleasure of doing so. On the contrary, it is an unpleasant duty to declare that a coordinate branch of government has exceeded its authority, and it ought never to be done, and I think I do not state it too strongly when I say it never has been done, only when in the opinion of the *31 court the act was absolutely irreconcilable with the constitution.
Nor is it of any importance to the court whether the legislation in its opinion is wise or unwise. With the policy or the practicability of the law the court has nothing to do. If the act is constitutional, or if its constitutionality is doubtful, the court has no discretion but to enforce the law as it is written, no matter what the effect of such enforcement may be. Courts are many times criticised for their judgments, when if their critics were to examine into the legislation upon which the judgment is predicated, the fault would be found not with the court, but with the law. However that may be, the fact remains that courts will not measure intellect with the lawmaking power of the state as to the wisdom of a law, but will enforce it regardless of consequences, unless forced to the conclusion that the act is clearly in conflict with the organic law of the state. With these principles in mind, we come to the consideration of the constitutional objections urged against this particular act.
First it is claimed that this act is in violation of Section 2 of Article V, of the constitution, requiring that all elections shall be by ballot. It is true that this section does use the word ballot in the singular, yet so far as this statute is concerned, it fills the terms of the constitution to the letter, for it provides for the election of judges by ballot. It is said that the spirit of the constitution is violated because it provides for a separate ballot and *32 therefore the election must be by ballots instead of by ballot. This is no departure from the established methods of elections in this state. The legislature has by many laws provided for separate ballots at the same election, and while I have not fully investigated all of the legislation touching this subject, it is sufficient to say that as far back as May 14, 1878, a law was passed providing for separate ballots; and again, June 10, 1879, the legislature passed an act which provided that in cities having a population of twenty thousand and upwards the names of candidates for representatives in congress should not be placed upon the same ticket with the name of a candidate for any state, county, township, or municipal office, to be voted for at the same election. This law also provided for a separate voting place. Section 5035,-General Code, provides that the names of candidates for assessor of real property, however nominated, shall be placed on an independent and separate ballot without any designation whatever, except for assessor of real property and the number of assessors to be elected. Section 5032, General Code, makes the same provision with reference to boards of education. To the same effect is Section 5029, General Code, and the law providing for the election of delegates to the last constitutional convention contains identical provisions with the provisions of this act.
Counsel for relator call attention in argument and in their briefs to this legislation, but urge that no effect should be given to this, because the constitutionality of such statutes has never been *33 questioned, and they have been considered valid rather by sufferance than reflection. It is undoubtedly true that two wrongs do not make a right, and if this act is clearly in violation of the provisions of this section of the constitution, then the fact that other legislation has been enacted by the general assembly of this state, also in contravention of its terms could be given no consideration in determining the question at bar. However, the fact that such legislation has been accepted and acted upon by the people of this state without objection is a matter of importance where there is any doubt touching the constitutionality of the act. It is an established doctrine of the law that where private citizens have made a contract and their conduct under that contract has given construction to its terms, the court in construing the same, will give great weight to the construction given it by the parties themselves, especially if the language is in any wise ambiguous. So in this case, where the people of this state have written a constitution defining and limiting the right and authority of the legislature, and the legislature in pursuance of the authority so conferred has enacted man}'- laws similar to the one now under consideration, that for years have been accepted without protest, not even one citizen challenging the right of the legislature to pass such a law, it would seem that those who have written the fundamental law of the state for their own protection have so construed it as to authorize such legislation, and this fact is one that should receive the consideration of this court. 'But aside *34 from this, if we are to look to the language of Section 2 of Article V only, still it would appear that this objection to this law is hypercritical and untenable. It is merely “sticking in the bark” to say that because the constitution provides for an election by ballot that that means that only one ballot may be used at the same election under any and all circumstances. If the legislature has authority to make a proper classification, which is no longer a question of doubt in this state, it follows then that such classification would require a separate ballot, and this one provision of the constitution must be construed so that effect may be given to all of its other provisions. This law requiring a separate ballot, if it offends for that reason against any of the provisions of the constitution, it would seem to be Section 1 of Article Y. This court in construing that section of the constitution in the case of Monroe v. Collins, 17 Ohio St., 665, among other things held that, “the legislature has no power, directly or indirectly, to deny or abridge the constitutional right of citizens to vote or unnecessarily to impede its exercise.” This we believe to be the correct view. A great many separate ballots might impede the constitutional right of citizens to vote, but it is apparent that this objection does not now obtain, and it is unnecessary for the court to anticipate it.
The second objection urged by counsel for relators is a much more serious one, and one that cannot be classed as technical in any sense of the word. Section 1 of Article V of the constitution, provides that: “Every white male citizen of the *35 United States of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county, township or ward in which he resides such time as may be provided by law, shall have the qualification of an elector and be entitled to vote at all elections.” It is insisted that this act adds another provision to the qualification of an elector, in that it requires him to be able to read in order to select the candidate for a judicial office for whom he may desire to vote. Counsel in their argument in support of this proposition, make the mistake of assuming that under the Australian ballot law, and the laws theretofore existing relating to the ballot, the illiterate voter could readily and without any difficulty whatever vote for the candidates of his choice. We are unable to see how the act in question adds anything to the past legislation, or the existing legislation on this subject, that would place such illiterate voter at any greater disadvantage than he was under prior to its passage. Laws must be general in their nature. They must afford to everybody equal opportunities under the law, but it is not possible for constitutions or legislation to make all men equal in understanding, intelligence and education, notwithstanding the whole course of our legislation tends in that direction, for it has been the care of the state that every individual should have equal opportunity to become educated, and to that end it is magnanimous in the expenditure of public funds. Not only that, the state not content with furnishing the means of education, has passed laws compelling the youth of our coun *36 try to take advantage of these opportunities. With reference to foreign born citizens who may become naturalized in this country, the laws of the United States require that every foreign born person who desires to become a citizen of the republic must file a petition in writing signed by the applicant in his own handwriting. (Section 15350-2, General Code; 34 U. S. Stats, at Large, 597, Chap. 3592; 4 U. S. Comp. Stats., 529.) Yet notwithstanding the provisions made by the state for the education of its citizens and the requirement of the act of Congress of the United States that an applicant for citizenship must subscribe his name to his application in his own handwriting, if this act in question adds anything further to the requisite qualification of a voter than is found in Section 1 of Article V, of our constitution, the act must fail, for it- is not the province of a court, nor of the general assembly, to change the constitution of the' state, even though it be conceded that the time has arrived when it ought to be changed. This question must be met and answered by the consideration of the language of this provision of the constitution and the language of the act under consideration, keeping in mind at all times not only the language of the act, but the necessary and natural effect that must follow. It must be conceded that the intention and purpose of all elections is to register the will of the people honestly expressed through the ballot, and every voter must use some intelligence in the exercise of his right and privilege, otherwise an election would be nothing more than a farce, unless indeed it should later develop into' a state *37 tragedy. The provisions of the constitution on this subject must be construed in light of the purposes to be accomplished, otherwise all legislation on the subject of the form and requirements of the ballot must be held to be in violation of these provisions. The constitution is silent as to the kind and character of ballot that shall be used. For many years the legislature left this important part of the machinery of our elections solely within the control of political parties, but there came a time when it was apparent that the legislature must deal with this subject and provide a uniform ballot for the use of the voters, otherwise it would be impossible to guard against election frauds.
Under the old order of things when political parties furnished to the voters ballots of different color and different size, it does not appear how it could have been easier then for an illiterate man to vote for the candidate of his choice, if that candidate happened to be upon a ballot opposite in politics to the ballot of his own political faith, than it now is for him to vote for a judicial candidate. It is true that he did have some advantage in selecting his party ballot, but that was the whole extent of the assistance given him by ballots differing in size and color. The legislature of the state in order to guard against election frauds, was compelled to and did take away from him even this slight advantage, and provided by law that all ballots should be uniform as to writing, printing and size and without any device or mark by which one ballot may be known or distinguished from another, except the words at the head of the *38 ballot. ' That provision of law with reference to the ballot was many-fold more vulnerable to attack as offending against Section 1 of Article V of the constitution than this act in question, for it deprived an illiterate voter of all means, except the writing or printing on the ballot itself, of determining the candidates of his party for purely political offices as well as judicial officers. The voter who could not read could not vote without the assistance of some one more fortunate than himself. He was compelled to rely upon others and therefore might become an easy victim of corrupt men, and yet no one seemed to think that this provision was unconstitutional or that it added an educational qualification to the qualifications named, in the constitution. This act was passed March 21, 1874, and elections were held under it without even challenging its constitutionality until the passage of the Australian ballot law.
The Australian ballot law permits political parties to select a device to be placed at the head of the column on the ballot occupied by the names of that party’s candidates. The legislature had theretofore provided that there should be no mark or device upon the ballot that would enable the voter to distinguish one from another by reason thereof, and the present provision allowing the same can be changed at the will of the legislature. If the present Australian ballot were to be stripped of these distinguishing marks or devices, in what position would it leave the illiterate voter? But even with these devices or emblems at the head of *39 the party column, the only aid they afford him is an opportunity to vote a straight party ticket. If he desires to vote for a friend of opposite politics, or if he desires to vote against any of the candidates on his party ticket, he is absolutely helpless and must depend upon the aid and assistance of others.
The laws of this state control party primary elections. The ballots to be voted at these elections have printed thereon the name of the office for which the candidate is to be selected, followed by a list of the names proposed for that particular office. The illiterate voter has the same right to vote at these primary elections as any other citizen of the state, and yet if he cannot read or write, how is he to select from these names the name of the candidate of his choice? In this year there was held in this state a Republican primary election for the purpose, among other things, of selecting delegates to the state convention. The names of delegates representing diametrically opposed views were placed indiscriminately upon this ballot, and the voter was compelled to select from these names the delegates for whom he desired to vote with no means whatever furnished by the ballot, or the election officers, to aid him in determining which delegates stood for certain principles and which for another, or to be more specific, which delegates stood for the endorsement of President Taft, and which stood for the endorsement of Ex-president Roosevelt, and even if this information were furnished to him, if he could not read or write, how would it aid him in casting this primary ballot?
*40 Exactly in line with the legislation .here in question is the act of the General Assembly of Ohio providing for the election of delegates to the last constitutional convention. That act provided that these officers should not even receive a party nomination, but that they should be nominated by petition only. Section 15 of the act reads as follows: “The names of candidates for members of the constitutional convention nominated as provided herein, shall be placed on an independent and separate ballot without any emblem or designation except the statement referring to separate submission of the question as herein provided, and the name or names of candidates for election and the number to be elected.” Section 16 of the same act provides for the rotation on the ballot of the names of the candidates. So that every argument against the constitutionality of this act, obtained against the act for the selection of delegates to prepare and present to the people of Ohio a new constitution. It would seem that in a matter of such grave importance as this the lawmaking power of the state would exercise extraordinary care and caution not to offend against any provision of the existing constitution, and the governor of the state when it was presented to him for his signature would also examine with particular care and diligence every provision thereof to determine whether constitutional or not before signing and approving the same. That law passed the scrutiny of both these branches of our state government, and yet it provided for a separate ballot and for non-partisan candidates, and presented to the illiterate voter the *41 same difficulties that it is now insisted he should not be compelled to encounter by the law relating to the election of a non-partisan, judiciary.
One of the leading cases involving the same principle is the case of Cook v. State, 90 Tenn., 408. Section 1 of Article IV, of the Constitution of Tennessee, provides that there can be no restrictions or qualification of the right to vote except the condition of the payment of a poll tax. On March 11, 1890, the legislature of that state passed an act entitled: “An act to provide more stringent regulations for securing the purity of elections,” etc. It was urged that this law was unconstitutional, because it required an educational qualification in that it imposed upon the elector the duty of being able to select for himself a ballot, and mark for himself the name or names of the candidates for whom he desired to vote. In disposing of the question the supreme court of that state said: “It is evident the framers of the constitution did not intend, by its conference of the right to vote, to ignore an educational qualification in all respects. It fixes the age at twenty-one, with a citizenship of the United States, and twelve months’ residence in the state, and of six months in the county. The age was fixed as one of maturity, at which period the law presumes the proposed voter to have sufficiently ripened in mental power to determine for himself the soundness or unsoundness of the measures upon which he is called to vote. Citizenship of the United States is a prerequisite, as fixing such interest in the welfare of the Federal Government as supposes a study of and acquaintance with its *42 governmental policy, and so of residence in the state and county, as well as to become acquainted with the character and capacity of the men who might ask office. These restrictions are terms of educational probation.”
No one questions that the word “ballot” used in the constitution means a written or printed ballot. The same provision was found in the constitution of this state adopted in 1802. So that, with more than one hundred years’ experience under this and an identical provision in our former constitution, a written or printed ballot has alwajrs been used in supposed conformity to this section. The question is, however, no longer an open one in this state. In the case of State, ex rel. Karlinger, v. Board of Deputy State Supervisors of Elections, 80 Ohio St., 471, this court held that the act of the general assembly providing for the use of voting machines at elections violated the terms of this section of the constitution providing that “all elections shall be by ballot,” and gave as its reasons for doing so that the word “ballot” as used in our constitution must be construed to mean a written or printed ballot. In the opinion by Shauck, J., at page 489, it is said:. “It was'not doubted then, nor has it ever been really doubted since, that it is a printed or written expression of the voter’s choice upon some material capable of receiving and reasonably retaining it, prepared or adopted by each individual voter and passing by the act of voting from his exclusive control into that of the election officers, to be by them accepted- as the expression of his choice.”
*43 The framers of our constitution and the people of the state when they adopted this section, must have known that there were then, and in all probability would. continue to be, electors of this state unable to read. Every argument made against this particular law might have been urged with equal force against the adoption of this provision of the constitution. But, if made, they'were made to no purpose, and the provision was adopted and is now unalterable except *by the same authority that made it the organic law of this state. It seems strange, almost amusing, that after more than half a century of experience under this constitutional provision, during all of which time the uneducated voter was laboring under equal and at times greater difficulties than are now presented by this law for the non-partisan election of judicial officers, the discovery should only now be made that all this is unconstitutional. When we turn to the provision of the constitution which is said to be violated by it, and find that the same objection might have been urged with equal propriety against its adoption, these objections lose all force, for it is apparent that just so long as we are to have elections by written or printed ballot, just so long must the uneducated man find it a difficult matter to vote for the candidate of his choice. In the case of State, ex rel. Bateman, v. Bode, 55 Ohio St., 224, Burket, J., writing the opinion of this court, said: “The ballot is the same for all, and gives equal protection and benefit to all. There is no discrimination against or in favor of any one; and if any inequality arises, it arises not from any *44 inequality caused by the statute, but by reason of inequalities in the persons of the voters, and such inequalities are unavoidable. It is always much more difficult for some electors to cast their ballots than for others. * * * But these difficulties inhere in the men themselves and not in the law.” In the consideration of these objections to this law, we must not overlook the fact that the election of officers is not the only purpose of an election. Other questions are submitted to the people of this state to be answered by the ballot. Very recently there was submitted the question of holding a constitutional convention, and following an affirmative vote a convention was held, and proposed changes in the constitution were submitted to the electors of this state. Every qualified elector has the same right to vote upon these questions as he has to vote for the election of officers. Any ballot provided for these elections' must meet the same constitutional requirements as a ballot for the election of officers. On these ballots there can be neither mark nor device of any kind. The voter must depend upon the written or printed matter upon the ballot. In such case, in what way is it possible to provide a ballot that will not be subject to each and every objection that is urged against this law?
This provision of the constitution was never written and adopted for the purpose and intention of compelling that to be done, which in the very nature of things could not be done. In construing all laws, whether it be the acts of die general *45 assembly or a provision of the constitution of the state, the necéssities of the situation must be taken into account. The very best that can be .done is to give to all electors an equal opportunity. In every phase of our social and civic life the uneducated man is at a disadvantage. The opportunities are the same for him as for others, but the unfortunate fact remains and must forever remain that he is not in position to take advantage of these opportunities. It is undoubtedly the duty of the legislature to guard and protect him in his rights in every possible way, consistent with the welfare of the state and the absolute necessity of securing by ballot an intelligent expression of the people’s will, but human ingenuity has not j^et discovered, and it is not likely that it ever will discover, any better or fairer means than the written or printed ballot, and if that ballot presents to the uneducated voter the difficulties complained of, the state is powerless to give him further aid, until some Solomon shall devise a plan and method that will obviate all these difficulties, and provide not only equal opportunities to all electors, but also provide some method by which all electors may be able to take advantage of these equal opportunities. Even then, the remedy must come, if it come at all, by a change in the provision of the constitution requiring elections to be held by ballot, and not by objections to the constitutionality of laws enacted in conformity therewith. It necessarily follows that this law must stand as a valid act of the lawmaking power of this state, or each and every other *46 law that has been passed during all these years must fail for the same reasons that are urged against the constitutionality of this act.
The claim is also made that this law does not take the judiciary out of partisan politics, but, on the contrary, involves the candidates in a personal political contest, that is far more dangerous and disastrous than if they were placed upon the party ballot. That may all be true. But, if this law does not effect the purposes for which it was passed, then it becomes the duty of the legislature to act and make such changes as in its wisdom may be necessary, even if that should require the repeal of the law itself. At all events, that inquiry is not for the court.
In view, therefore, of the fact that the constitution provides that all elections shall be by ballot; that this means a written or a printed ballot; that every written or printed ballot must necessarily present some difficulties to the voter who cannot read; that there is no constitutional guaranty that the ballot shall bear any mark or device by which a voter may determine from the ballot itself, except from the written or printed matter thereon, which is and which is not the ballot of the party of his affiliation, it follows that this legislation does not offend against this provision of the constitution.
The third objection advanced by counsel for relators is that this law is in violation of Section 26, of Article II, of the constitution, in that it does not operate uniformly on the subject-matter of elections. This provision of the constitution requires that all laws of a general nature shall have *47 uniform operation throughout the state, but the question is now settled that a law that “operates upon every person brought within the relation and circumstances provided for and in every locality where the condition exists is a law of uniform operation throughout the state.” Cincinnati v. Steinkamp, 54 Ohio St., 284-295; State, ex rel., v. Creamer, 85 Ohio St., 349; Miller v. Crawford, 70 Ohio St., 207; State, ex rel., v. Spellmire, 67 Ohio St., 77.
It would therefore appear that the general assembly has authority to make a reasonable and proper classification, and if it has done so in this case, that is the end of the inquiry.
The purpose of this law is to withdraw candidates for judicial offices from partisan politics. It still leaves to political parties the right to place candidates for judicial offices in nomination, and when so nominated the names of these candidates must be placed upon a separate non-partisan ballot. If there is no reason for the classification attempted in this law, then the legislature would have no authority arbitrarily to deprive a candidate for judge of the privilege enjoyed by candidates for offices in other departments of state. In order to determine the reasonableness or unreasonableness of this classification, it is necessary to compare the respective duties of the officers of these different branches of government. Legislative and executive officers are selected for the avowed purpose of promulgating definite principles and methods of government advanced by the respective parties that place them in nomination, and to this end *48 party platforms are written for the purpose of enunciating the principles for which that party and its candidates stand, and the candidates for these offices so placed in nomination are pledged to the support of these principles; therefore, it is highly important that the electors of the state should know the political affiliation'of the candidates for these offices, for in this respect it is perhaps not so much the personality of the candidate, as the measures they advocate and are pledged to support, that influence the individual voter. No partisan political platform can be written for the judge. He is charged with the interpretation and the administration of the law as he finds it. He has no voice in framing it. He must not depart from the plain provisions thereof, no matter how much he may be opposed to the principles or purposes of it. In the discharge of his duty a judge is not concerned with party platforms or party expediency. In his official capacity he can serve no party, promulgate no partisan theories of government, encourage no partisan economic measures.
By common consent it has always been regarded highly improper for a judge or a candidate for judicial position, to serve upon party committees or make partisan speeches. He is required to keep his mind free from partisan bias and prejudice, so that he may be in a position to protect the rights of all litigants and determine the justice of every cause, regardless of political influence. If the judicial office is a political office in the sense in which that term is generally understood, there would be neither “rhyme nor reason” in placing *49 such restrictions upon a candidate for judge. In the year following the adoption of the present constitution, the general assembly of this state recognized this difference between judicial officers and officers in the other departments of state, and required by an act passed February 19, 1852 (50 Ohio Laws, 67-71), that a different oath of office should be administered to the judge than the oath required to be taken by other officers, and that act still remains the law of this state. This oath of office requires him “to support the Constitution of the United States and the Constitution of the State of Ohio, to administer justice without respect to persons, and faithfully and impartially to discharge and perform all the duties incumbent upon him as such judge according to the best of his ability and understanding.” The right of the legislature so to place the judiciary in a separate and distinct class, and require them to take this different oath from the oath administered to all other officers has never yet been questioned, although this law was enacted by the first general assembly of Ohio following the adoption of the constitution of 1851. It follows then from a consideration of these facts, that there is a substantial difference between the duties of judicial officers and the officers in the other departments of our government, and a consideration of these differences leads to the conclusion that the classification made by the legislature is a reasonable one. The question of the advisability of making such a classification is one for the legislature and not for the courts. The only question with which the court is concerned is *50 whether there is such a difference in the duties of these officers as to make such classification reasonable. It is contended that the voter is entitled to know the candidate for judge placed in nomination by his party, to the end that he may be advised of the principles. and policies for which he stands. But, if the legislature has the right to take the judiciary out of partisan politics, then the reasoning upon which this argument is based must fail. As a matter of fact, it never had any foundation in law. No matter how necessary political parties may be to a republic, in this state they have not been made the beneficiary of any constitutional provision whatever, and while many of our laws are framed with reference to the fact that political parties exist, yet there is absolutely no constitutional objection whatever to legislation, however unwise such legislation may be, that does not recognize them as a factor in our state and national existence. That a candidate may be placed in nomination for a political office, suggests the idea that the candidate so nominated has a right to have his name printed upon that party’s ballot. The constitution guarantees him no such right. The legislature of the state may give or take such right from him at its pleasure, provided, however, that it does not confer such right upon candidates for some office and refuse such right to candidates for other offices, unless there is such a difference in the offices to be filled as would make such classification reasonable. There is undoubtedly merit in the argument that no political party would likely place in nomination a candidate for judge *51 unworthy of the place or unfitted for the position. A political party may recognize the fact that a judicial officer cannot be of service to it in a partisan way, and yet be deeply concerned in giving to the state an honest and capable public servant, and where the individual voter is not fully advised of the respective merits of the candidates he might be, and probably would be, very willing to rely upon the judgment of his party, but, under the existing legislation there is absolutely no reason why he should not know the candidates for these offices placed in nomination by his party. Every individual educated or uneducated seeks to advise himself with reference to every important affair of life. The casting of a ballot is one of the most important, duties of citizenship, and every good citizen should be willing to give some investigation to the character, the standing, the ability and if he deems it important, to the political affiliation of judicial candidates. The voter who will not undertake to advise himself upon these matters, holds too lightly the privilege and prerogative of the ballot, and there would seem to be no just reason why legislation should be shaped to meet his convenience.
These questions, however, are for the legislature and not for the court. With the wisdom of this law we have nothing to do, nor is our opinion in that respect in any wise important. It is sufficient to say that for the reasons given the constitutionality of this law is not even doubtful, but on the contrary, it is clear that it does not offend in any particular against the constitution of our state, and, *52 therefore, it is a valid act of the legislature, and as such must be given full force and effect.
The judgment of the circuit court in the case of State, ex rel. Morris J. Weinberger, a Taxpayer, v. Daniel T. Miller et al., is affirmed. In the case of State, ex rel. Fritch, v. Board of Deputy State Supervisors of Elections, a peremptory writ of mandamus is refused, and the petition in said cause dismissed at cost of relator.

Judgment accordingly.

Johnson and O'Hara, JJ., concur. Davis, C. J., and Shauck, J., dissent. Spear, J., not participating.